# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs September 2, 2016

### IN RE GABRIELLA D.

**Appeal from the Circuit Court for Hamilton County**
**No. 13A193     L. Marie Williams, Judge**

---

### No. E2016-00139-COA-R3-PT-FILED-NOVEMBER 30, 2016

---

This is a termination of parental rights case involving Gabriella D., who was age seven at the time of trial. The mother, Carla D. ("Mother"), and the father, Julius D. ("Father"), have three children currently involved in termination actions: Chance D., Gabriella D., and Jude D. (collectively, "the Children"). Mother and Father have an extensive history with child welfare agencies and the courts in both Tennessee and Georgia.[1] In March 2012, the Hamilton County Juvenile Court ("juvenile court") granted temporary legal custody of the Children to the Tennessee Department of Children's Services ("DCS"). Upon their placement in DCS custody, the Children were placed in the home of Karen P. and Thomas S. (collectively, "Foster Parents").[2] DCS did not seek a finding of severe child abuse against Mother in the dependency and neglect action in juvenile court. Foster Parents filed a petition to terminate the parental rights of Mother and to adopt Gabriella D. ("Gabriella") in the Hamilton County Circuit Court ("trial court") on July 31, 2013. Foster Parents concomitantly filed separate termination of parental rights actions involving Gabriella's two siblings, Chance D. ("Chance") and Jude D. ("Jude"). Following a bench trial, the trial court found by clear and convincing evidence that Mother had committed severe child abuse against Chance while he was in her custody. The trial court recognized that the determination of severe child abuse against Chance was a ground for termination of Mother's parental rights to Gabriella. The trial court also found, however, that Foster Parents had not proven by clear and convincing evidence that the conditions leading to the removal of the Children persisted or that termination of Mother's parental rights was in Gabriella's best interest.[3] The trial court thereby denied

---

[1] Father surrendered his parental rights to the Children prior to trial and is not participating in this appeal.

[2] Initially, only Gabriella and Jude were placed with Foster Parents while Chance remained hospitalized. When Chance was released from the hospital, he was also placed with Foster Parents.

[3] Foster Parents have not raised on appeal the issue of persistence of conditions; therefore, we deem that issue as waived on appeal. *See* Tenn. R. App. P. 27(a)(7); *Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 617 (Tenn. 2010) (determining an issue to be waived when the appellant failed to argue the issue or cite any legal authority in support of his position).

the petition to terminate Mother's parental rights to Gabriella. Foster Parents have appealed. We affirm the trial court's finding that the statutory ground of severe child abuse was proven by clear and convincing evidence. However, having determined that Foster Parents also proved by clear and convincing evidence that termination of Mother's parental rights was in the best interest of Gabriella, we reverse the trial court's denial of the termination petition. We therefore grant Foster Parents' petition for termination of Mother's parental rights to Gabriella. We remand this matter to the trial court for an adjudication regarding Foster Parents' petition for adoption.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., joined. J. STEVEN STAFFORD, P.J., W.S., filed a separate opinion, concurring in part and dissenting in part.

Susanne Lodico, Chattanooga, Tennessee, for the appellants, Karen P. and Thomas S.

Rachel M. Wright, Hixson, Tennessee, for the appellee, Carla D.

Herbert H. Slatery, III, Attorney General and Reporter, and Rachel E. Buckley, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

This action commenced when Foster Parents filed a petition on July 31, 2013, seeking to terminate Mother's parental rights to Gabriella and to adopt her.[4] As statutory grounds, Foster Parents alleged that the conditions leading to the removal of the Children persisted and that Mother committed severe child abuse against Chance due to his severe malnutrition at the time of the removal. Foster Parents further alleged that the termination of Mother's parental rights was in the best interest of Gabriella. Mother subsequently filed an answer to the petition, requesting that the trial court find that grounds did not exist to terminate Mother's parental rights and that termination of Mother's parental rights to Gabriella was not in Gabriella's best interest. DCS also filed an answer, requesting that Foster Parents' petition be dismissed. A trial was conducted on September 8-10, 2015.

---

[4] When Foster Parents filed the petition in this matter, the Children were in Foster Parents' physical custody.

Prior to this termination action, Mother had an extensive history with law enforcement and the child welfare agencies in both Georgia and Tennessee. Foster Parents subpoenaed records from the Georgia Division of Family and Children Services ("GDFCS"), and these documents were admitted as exhibits at trial. The records demonstrate that in May 2005, GDFCS opened a case involving this family upon a referral of emotional and psychological neglect due to domestic violence in the home. According to the GDFCS records, that case was "substantiated" and closed in June 2005. In February 2006, GDFCS removed Mother's two oldest children, H.F. and W.F., from the parents' custody after Mother and Father were involved in an automobile accident while they were intoxicated with H.F. in the vehicle.[5] Both parents and H.F. were transported to the hospital. Hospital personnel would not release H.F. to the parents because of concern regarding the parents' ability to care for H.F. due to the parents' intoxication. According to records from Georgia, the parents tested positive for marijuana, benzodiazepines, and methadone at the hospital and had to be shaken in order to elicit a response.

Following this incident, both H.F. and W.F. were removed from the parents' home and placed into state custody in Georgia. At the time of removal, the younger child, W.F., was less than one month old. According to GDFCS records, W.F. was experiencing withdrawal symptoms and presented with a severe case of thrush when he was placed into state custody.[6] The parents did not comply with the case plan developed by GDFCS and continued to abuse drugs. On September 11, 2007, Mother's and Father's parental rights to those two children were terminated by the Juvenile Court of Catoosa County, Georgia ("the Georgia court"). In the final order terminating parental rights, the Georgia court found as follows:

> The Court has previously found a cause of deprivation of substance abuse by the parents. Neither parent has provided six consecutive months [of] negative drug screens nor have they completed a substance abuse treatment program. The father has failed to complete anger management counseling. The parents have failed for greater than one year to complete a case plan designed for the reunification of the children with the parents. The parents suffer from mental illness rendering them incapable of properly parenting the children and have failed to seek appropriate mental health treatment. The parents have physically, mentally and emotionally neglected the children and have failed to protect the children from the

---

[5] H.F. and W.F. are not involved in this proceeding. Mother's parental rights to these children were previously terminated, and they have been adopted.

[6] According to the Georgia records, the thrush was caused through yeast from the mother and dirty bottle nipples.

3

maternal grandmother who has a criminal history. The parents have failed
for greater than one year to maintain a meaningful and supportive parental
bond with the children. The parents have failed to support the children.

Based upon those facts, the Georgia court terminated Mother's and Father's parental
rights to H.F. and W.F.

Shortly thereafter, Mother gave birth to Gabriella in March 2008, while residing in
Georgia. After Gabriella's birth, GDFCS received a referral due to Mother's past drug
use. Consequently, GDFCS petitioned the Georgia court for court-ordered drug screens
and cooperation from the parents with the investigation. On June 26, 2008, GDFCS
received another referral, alleging that the parents were smoking marijuana in the
presence of Gabriella and that they were abusing prescription medication. While law
enforcement was in the home, officers observed Father to be under the influence while
caring for Gabriella. At that time, Father was holding Gabriella and attempting to place
her into a bouncy seat on the floor. Father dropped Gabriella, causing her to hit her head
on the plastic seat. Additionally, police officers found drug paraphernalia in the home,
and a count of Mother's prescription medication indicated fewer pills remaining than
there would have been if the medication had been taken as directed. At that time,
Gabriella was placed into state custody in Georgia. Mother filed a petition for a
protective order against Father in Georgia on July 22, 2008. In June and September
2008, Mother indicated that she planned to divorce Father.

Eventually, Mother did comply with a GDFCS case plan, and the Georgia court
restored custody of Gabriella to Mother on February 2, 2009. The court thereupon
ordered that "[M]other shall ensure that the father shall have no contact with the child
[Gabriella]." The Georgia court also ordered GDFCS to provide "aftercare" for Mother
and Gabriella for thirty days following entry of the order.

During her testimony at trial in this action, Mother acknowledged that she
immediately resumed her relationship with Father upon regaining custody of Gabriella.
She became pregnant with Jude shortly thereafter. Mother admitted that she reunited
with Father despite her knowledge of the Georgia court's no-contact order. Mother
further testified that she immediately recommenced her drug use when she resumed her
relationship with Father.

At some point, Mother and Father moved to Tennessee.[7] Jude was born to Mother
and Father in December 2009, approximately ten months after Mother regained custody
of Gabriella through the Georgia court. Mother testified that Jude was born drug-

---

[7] The date of the parents' relocation to Tennessee is not contained within the record.

addicted. DCS received a referral due to Jude's drug addiction at the time of his birth. While neither Jude nor Gabriella were removed from Mother's care at that time, DCS required Mother to complete an alcohol and drug assessment, which task she accomplished.

On May 12, 2010, Mother was at work when an unrelated child died in the parents' home while in Father's care. Upon returning home from work, Mother discovered Father intoxicated and passed out on the floor. In June 2010, DCS received a new referral and was advised of the Georgia court's no-contact order prohibiting any contact between Gabriella and Father. Contemporaneously, Mother failed a drug screen. At trial in the instant action, Mother admitted that she had been using drugs at that time. Consequently, the juvenile court entered an order placing Gabriella and Jude into state custody in Tennessee. Jude and Gabriella were released back to Mother's custody three days later. DCS thereafter developed a non-custodial permanency plan requiring Mother to cease her drug use and keep Gabriella and Jude away from Father until Father received treatment for his drug use. Mother passed three drug screens and informed DCS that Father realized he could not return to the home until he addressed his drug issues. DCS then closed its case on August 20, 2010, with Jude and Gabriella remaining in Mother's custody.

In September 2011, Chance was born to Mother and Father. At birth, Chance weighed six pounds, fourteen ounces. Six months after his birth, Chance weighed a mere seven pounds, six ounces, having gained only eight ounces. Mother conceded that she knew it was not appropriate for Chance to gain half a pound in six months. According to Mother, she did not seek medical care for Chance because she was afraid DCS would become involved and the Children would be removed from her. Finally, on March 5, 2012, Father took Chance to a physician. Chance was immediately transported to the emergency room at a local hospital where he remained for four days. The Children were then removed from the parents' custody and ordered into the custody of DCS by the juvenile court. The juvenile court later adjudicated the Children as dependent and neglected and ordered that they remain in foster care.

Mother explained at trial that during the first six months of Chance's life, she was feeding Chance six to eight ounces of formula six to eight times per day with some baby cereal. She further indicated that Chance was not spitting up more than a normal baby and that he did not experience excessive diarrhea. According to Mother, she was not working outside the home during those months and was the person responsible for feeding Chance.

Meanwhile, Ed Merritt, a detective with the Hamilton County Sheriff's Department, investigated child abuse allegations regarding Chance. In the course of his

investigation, Detective Merritt observed Chance in the hospital and described his emaciated condition. At the conclusion of the investigation, a Hamilton County grand jury indicted Mother on the charge of aggravated child abuse.

At trial, Karen P. ("Foster Mother") described the Children's conditions when they initially arrived at her home. Foster Mother testified that Gabriella was nearly four years of age when she came to the foster home, and she was not able to recite her alphabet, count to ten, or spell her name. According to Foster Mother, Gabriella also used inappropriate language upon her initial arrival. She further explained that Gabriella and Jude were infested with lice, which required a prescription for treatment. Additionally, Gabriella and Jude had not received proper vaccinations. According to Foster Mother, Jude and Gabriella "were so far behind[,] . . . they couldn't be given all of [the vaccinations] at one time." Foster Mother also explained that Jude would chew food and keep it in his cheeks upon his arrival at the foster home. Chance, still hospitalized when Gabriella and Jude first came to Foster Parents' home, resembled "a newborn." Foster Mother explained that Chance had a large head, distended belly, and legs like "tiny sticks." She further described Chance as appearing emaciated; unable to hold up his head; and maintaining a consistent, unresponsive, blank stare.

Foster Mother spoke of Mother's appearance at a medical appointment for Jude as "kind of out of it, slurring her words, [and] not steady on her feet." She also opined that Mother "appeared as if she was on some sort of narcotic." According to Foster Mother, during the medical appointment at which Jude's motor skills and cognitive skills were tested, the nurse asked whether Jude had any relevant medical history. Mother responded that he had no medical issues. Foster Mother testified that she was concerned that Mother's omission could affect Jude's medical treatment and informed the nurse that Jude was born addicted to drugs. As Foster Mother related, Mother brought a photograph album for the Children to view, which included a photograph depicting Father appearing to hold a "joint." The album also contained a photograph of Chance prior to his arrival at the foster home. The photograph corroborates Foster Mother's and Detective Merritt's respective testimonies regarding Chance's emaciated condition.

Regarding extended visits with Mother, Gabriella initially became upset and did not wish to participate. Foster Mother explained that when the unsupervised visits with Mother were extended, the Children's behaviors regressed to "the old pattern of when [they] first got them." The Children would return to normal, however, after a few days again in the foster home. Expressing concerns about the Children's visits with Mother, Foster Mother stated that the Children were complaining of hunger following one particular visit. On that occasion, Mother had taken the Children for pancakes after picking them up from daycare but did not return them in time for lunch. Upon their return, Mother did not inform the daycare that the Children had not eaten lunch. Foster

6

Mother testified that she was concerned because Mother's neglect in feeding Chance was the reason the Children had been placed into foster care. Foster Mother also expressed concern that during another visit, Mother brought Jude back to daycare with a 104-degree fever but failed to inform the daycare of Jude's condition. According to Foster Mother, the daycare staff observed that Jude did not appear well immediately upon his return from the visit with Mother. The daycare staff thereafter called Foster Parents, who took Jude to a physician. Foster Mother testified that she was concerned because although a 104-degree fever is "excessive and dangerous," Jude was "just brought back to school" by Mother. Foster Mother further related that Chance returned to the foster home after an overnight visit with Mother with "one of the worst cases of diaper rash that he's had since [they] had custody of him."

The Children were in the physical custody of Foster Parents for nineteen months. Both Foster Parents testified regarding their substantial efforts during the Children's time in the foster home to overcome the Children's respective developmental delays. Foster Parents became very close to the Children with the Children eventually calling them "mommy" and "daddy." Foster Parents also expressed their love for and desire to adopt the Children.

Paul Dassow, MD, MSPH, an expert in the field of family medicine and pediatric care, testified regarding Chance's medical condition at approximately six months of age. According to Dr. Dassow, Chance was born in September 2011, weighing six pounds, fourteen ounces. Upon his review of Chance's medical records, Dr. Dassow indicated that on March 5, 2012, Chance was admitted to the hospital weighing only seven pounds, six ounces, and upon admission, an "inital assessment for Chance was 'severe physical neglect resulting in failure to thrive, and some developmental delay.'" In forming his opinion, Dr. Dassow examined the statements Mother provided to medical personnel. According to medical records, Mother informed hospital personnel that she noticed Chance was not growing approximately three months prior to his hospital admission. Mother further reported that Chance drank approximately six ounces of formula with rice cereal every three to four hours and also consumed cereal and baby food with a spoon once per day. Following placement in foster care, Chance gained three pounds in the first month. He subsequently gained another four pounds by May 11, 2012. Thereafter, Chance continued gaining weight and by his last visit, "was a healthy two year old boy," according to an attending nurse.

Through his initial affidavit presented to the trial court, Dr. Dassow opined as follows:

> In my over twenty years of experience as a Medical Doctor, this is
> the worst case of failure to thrive and malnutrition in a six-month-old that I

have seen or reviewed, including cases in Africa that resulted in infant death. In my review of Chance's records, I am repeatedly shocked by his limited weight gain and I am very surprised that this little boy survived.

Based on my review of the Records, there is no medical reason or explanation for Chance's failure to gain weight other than his parents' failure to feed him appropriately.

Mother's description of Chance's feeding is a medical impossibility based on the number of calories that would have been provided to Chance and the amount of weight he gained, or failed to gain, during the first six months of his life.

It is my opinion that Chance was neglected to the extent that he was likely to suffer serious bodily injury or death. My opinion on this matter is made with more than a reasonable degree of medical certainty and, as I stated earlier, I am very surprised this child survived.

It is my opinion that Mother's failure to seek medical help for her child the moment she realized he was not appropriately gaining weight was neglect that exposed Chance to serious bodily injury and death.

Without examining the child myself and performing certain tests, I cannot reach an opinion as to any persistent developmental delays, intellectual disabilities, and/or impairments that Chance may suffer. It is my opinion, however, to a reasonable degree of medical certainty, that malnutrition can cause developmental delays, intellectual disabilities, and/or impairments, especially when the malnutrition is as severe and as early as Chance's.

(Paragraph numbering omitted.) In a second affidavit by Dr. Dassow, he opined as follows regarding the effect that Chance's severe malnutrition could have on development:

Based on World Health Organization's (WHO) definitions for malnutrition, Chance was well below the 1st percentile for weight at 6 months placing him in an "Acute Severe Malnutrition" status.

Robust data generated by the World Health Organization shows that infants at 6 months of age who are suffering from Acute Severe

8

Malnutrition are at high risk of dying from a variety of causes due to impairment of bodily functions.

Further, I have reviewed research regarding the effects of Acute Severe Malnutrition on infants and, based on the results of my research, I have formed an opinion as to whether or not the malnutrition suffered by Chance D[.] is reasonably expected to result in neurocognitive delay or intellectual disability or any impairment of his ability to function adequately in his environment.

Research published in December of 2014 regarding the Health Related Quality of Life (HRQOL) in school children with a history of early severe malnutrition indicates that these children tend to suffer from long term complications, particularly learning and psychosocial disorders. This particular study compared children, ages 5 to 12, who have a history of early severe malnutrition with their siblings who did not suffer from early severe malnutrition.

Another older study, published in December of 1996, indicates that children who suffered from malnutrition during infancy presented lower scores in memory and problem solving tests than children who did not suffer from malnutrition during infancy. This study concluded that early severe malnutrition had negative effects on basic cognitive function that became apparent during early childhood education. Again, this study compared a group of children who had been severely malnourished with a group of healthy children.

I've also reviewed research that indicates the victims of severe early malnutrition continue to suffer effects into adulthood. Research published in September of 2014 indicates there are long term negative cardiovascular effects from early malnutrition and research published in December of 2014 indicates that early severe malnutrition significantly contributes to dementia later in life.

It is difficult, if not impossible, to determine if a three (3) year old is suffering or will suffer from neurocognitive delay or intellectual disability or any impairment of his ability to function adequately in his environment as a result of severe malnutrition during the first six (6) months of his or her life since effects on memory, problem solving, and psychosocial functioning often will not manifest until the child starts school.

9

In addition, performing an evaluation on Chance [D.] at this time would be complicated by the fact that there was no baseline neurocognitive evaluation completed at the time of his birth or during the period that he was severely malnourished. Thus, there is no data to use to assess Chance D[.]'s baseline neurocognitive abilities.

It is my opinion, to a high degree of medical certainty, that the severe malnutrition suffered by Chance D[.] during the first six (6) months of his life placed him at high risk for early death and that the degree of malnutrition he endured is reasonably expected to result in neurocognitive delays and disability that will become apparent during his primary schooling.

(Paragraph numbering omitted.) According to Dr. Dassow's testimony at trial, Chance required extensive physical therapy for approximately a year and a half after being discharged from the hospital.

DCS Family Services Worker Latisha Ball testified that she was assigned to the case from March 2012 until the end of October 2012. After the Children were placed in foster care, DCS developed a permanency plan on March 21, 2012, with a single goal of "Return to Parent."[8] This plan required Mother to (1) ensure that the Children have a safe, stable home; (2) maintain a safe, stable home for the Children for no less than six months; (3) undergo a mental health intake to determine her treatment needs; (4) pay child support; (5) adhere to the supervised visitation plan to visit with the Children; (6) sign releases to allow DCS to obtain information; (7) notify DCS of any change in circumstance; (8) attend medical appointments for the Children and timely seek medical attention for the Children when needed; (9) obtain a legal, verifiable source of income; (10) resolve all legal issues and not accrue new criminal charges; (11) complete an alcohol and drug assessment and follow all recommendations therefrom; (12) submit to random drug screens; (13) complete the medically supervised weaning process at the methadone clinic to wean herself from methadone; (14) not sell the methadone wafers to others; (15) not associate with known drug users; (16) continue ongoing group meetings to address her drug addiction; and (17) commit to staying sober, including submitting a sobriety plan to DCS in writing.

---

[8] Pursuant to Tennessee Code Annotated § 37-1-166(g)(4), DCS is not required to make reasonable efforts to assist a parent whose rights were previously terminated involuntarily to a sibling or half-sibling of the subject child or a parent who has committed severe abuse against the subject child or any sibling or half-sibling of the subject child. DCS, however, elected to make reasonable efforts to reunite Mother and the Children after the Children came into DCS custody.

According to Ms. Ball, because Mother was initially not in compliance with the permanency plan, Ms. Ball had discussed adoption with Foster Parents. Ms. Ball explained that she had also relayed information to Foster Parents that DCS planned to amend its petition in juvenile court to include allegations of severe child abuse. The petition was never amended, however, and the juvenile court did not address severe child abuse at the adjudicatory hearing.[9] According to Ms. Ball, Mother began complying with the requirements of the permanency plan when Mother and Father separated in July 2012. The record establishes that Mother's last positive drug screen was on June 6, 2012.

DCS Family Services Worker Kelly Dyer testified that she was assigned to this case in November 2012. Ms. Dyer explained that Mother had begun complying with the requirements of the permanency plan by the time Ms. Dyer acquired the case and that she ultimately completed all of the requirements of her permanency plan. Specifically, Mother had completed in-home education classes, which included instruction in domestic violence, proper nutrition, appropriate discipline, various parenting topics, the impact of alcohol and drugs on children, and the impact of domestic violence on children. Ms. Dyer elaborated that Mother had continued her participation with in-home alcohol and drug education, as well as attending a class similar to Narcotics Anonymous. Additionally, Mother completed a program entitled "Celebrate Recovery," wherein she was subjected to random drug screens. According to Ms. Dyer, Mother visited with the Children, obtained employment that she had retained for over two years at the time of trial, and maintained housing for two years. Furthermore, Ms. Dyer maintained that Mother had a support system through the maternal grandmother and maternal uncles, all of whom assisted her in caring for the Children. At the time of trial, the Children had been placed with Mother for approximately two years on a trial home visit. Ms. Dyer testified that DCS intended to restore custody of the Children to Mother, emphasizing that the Children were attached to Mother and doing well in her care.

During the pendency of the dependency and neglect action in juvenile court, Mother returned to Georgia to reside with the maternal grandmother and a maternal uncle. Consequently, DCS submitted a request to the state of Georgia, pursuant to the Interstate Compact on the Placement of Children (ICPC), seeking to place the Children with Mother. Georgia's Department of Human Services denied the ICPC request to place the Children with Mother in Georgia and stated in its response: "There is CPS history in Catoosa County with this family. [Mother] appears to be continuing the pattern of behavior that resulted in a Termination of Parental Rights for two children here in Georgia." Following the denial of the ICPC request, Ms. Dyer encouraged Mother to

---

[9] The adjudicatory hearing order is not contained within the appellate record. It is undisputed that DCS did not seek a severe abuse finding against Mother at the adjudicatory hearing. It is further undisputed that the juvenile court did not address the issue of whether Mother committed severe abuse against Chance.

return to Tennessee. By June 2013, Mother had obtained housing in Tennessee. Upon the juvenile court's approval, the Children began the trial home visit with Mother on October 2, 2013.[10] As of trial, the Children remained on a trial home visit with Mother. Ms. Dyer testified that DCS planned to restore legal custody of the Children to Mother with no continued services.

Mother was arrested on September 4, 2013, and charged with aggravated child abuse against Chance due to his severe malnutrition. On March 26, 2014, Mother pled guilty to attempted child neglect, a class A misdemeanor, and was sentenced to eleven months and twenty-nine days of incarceration, to be suspended upon good behavior. Mother was also to complete six months of supervised probation and six months of unsupervised probation as part of her criminal sentence. Melanie Benson, Mother's probation officer, testified that as part of her probation, Mother was required to call the "drug line," which afforded Mother a one-day notice to report for her drug screen; pay supervision fees; pay court costs; provide proof of employment; and provide proof of any prescriptions she may have had that would cause her to test positive on a drug screen. According to Ms. Benson, Mother fully complied with the terms of her six-month supervised probation. Ms. Benson also explained that Mother tested positive for hydrocodone on one drug screen but that Mother provided a corresponding prescription for hydrocodone.

During trial, Mother testified that Father was abusive and that she had been separated from Father for three years. She had filed for divorce and intended to proceed

---

[10] We note that the termination and adoption action was pending in the trial court at this time. Pursuant to Tennessee Code Annotated § 36-1-116(f)(2), the juvenile court would not have had the authority to hear custody and visitation matters, including the commencement of a trial home visit, following the filing of the adoption petition in the trial court. Tennessee Code Annotated § 36-1-116(f)(2) states in pertinent part:

> Except for proceedings concerning allegations of delinquency, unruliness, or truancy of the child under title 37, any proceedings that may be pending seeking the custody or guardianship of the child or visitation with the child who is in the physical custody of the petitioners on the date the petition is filed . . . be suspended pending the court's orders in the adoption proceeding, and jurisdiction of all other pending matters concerning the child . . . shall be transferred to and assumed by the adoption court; provided, that until the adoption court enters any orders affecting the child's custody or guardianship as permitted by this part, all prior parental or guardian authority, prior court orders regarding custody or guardianship, or statutory authority concerning the child's status shall remain in effect. Actions suspended by this section, regardless of the stage of adjudication, shall not be heard until final adjudication of the action for termination of parental rights or adoption regarding the same child, even if such adjudication of the termination of parental rights or adoption will render the custody, guardianship, or visitation action moot.

with the action. According to Mother, she had been in her current home for two and one-half years and had been "clean and sober" for three years by the time of trial. As evidenced through testimony and Mother's subpoenaed medical records, Mother did obtain five short-term prescriptions for opiates during the fourteen months preceding trial. Mother received a prescription for hydrocodone connected with dental work in July 2014 and another prescription for Percocet associated with dental work in September 2014. Mother testified that she consumed the entire prescription both times. On November 15, 2014, Mother received a prescription for hydrocodone due to an abscess on her armpit resulting from an ingrown hair. Two days later, Mother returned for a follow-up appointment and was prescibed Percocet. Mother testified that she informed the prescribing physician that she had some hydrocodone pills remaining, but he wrote her a prescription for Percocet because, according to Mother, "[The doctor] said [the abcess] was really bad."

According to Mother's medical and dental records, Mother did not disclose her opiate addiction to either her dentist or her treating physicians prior to receiving those prescriptions. At trial, Mother further testified that she had been currently prescribed thirty pills of Percocet due to a broken foot. The record does not contain a medical record to substantiate this injury. According to Mother, hydrocodone and Percocet were among her drugs of choice when she was addicted to drugs. In addition to failing to inform her physicians or dentist of her history of drug addiction, Mother acknowledged that she did not request prescriptions for a non-narcotic pain medication.

Mother testified that after her separation from Father, she changed her phone number and blocked Father on social media. In July 2014, Jude answered her cellular telephone when Father called. She heard Jude speaking to the caller. According to Mother, she hung up the telephone when she learned that Jude was speaking to Father. She indicated that when Father called back, she inquired as to why he was calling. Mother insisted that she had not given Father her phone number but had provided her phone number to an individual on a dating website, Plenty of Fish. Mother testified that she learned from Father that he had obtained her phone number from the individual on the dating website. Mother did not inform DCS of the contact. Additionally, Mother instructed the Children not to discuss Father's communication with anyone. Notwithstanding, Gabriella informed Ms. Dyer of this incident and Mother's instructions to the Children not to disclose that contact with Father.

Dr. Alice Greaves, a Senior Psychological Examiner employed at the Center for Individual and Family Effectiveness, also testified as an expert. Having conducted a parenting assessment with Mother in May 2013, Dr. Greaves opined that Mother was inclined to trust her emotions more than logical reasoning when making decisions. According to Dr. Greaves, testing further demonstrated that Mother showed a high degree

of ambition and a "very strong drive to succeed." Dr. Greaves recommended that Mother "see the drug rehabilitation through to completion," continue her domestic violence group "until the group leader feels she is ready to move on," and engage in individual therapy. The recommendation also included that Mother not undergo a psychiatric evaluation for her anxiety but instead learn to manage her anxiety in therapy due to her lengthy substance abuse history and the potential temptation of psychiatric medication.

Dr. Greaves opined that Mother's short-term use of prescription medication with an appropriate medical necessity would not be concerning when supervised by a physician. She also indicated that a short-term prescription in response to a medical procedure would not be considered a relapse. Dr. Greaves explained, however, that a problem would arise if Mother were seeking pain medication on a long-term basis. Although Dr. Greaves acknowledged that Mother's five prescriptions in the past year for pain medication could be problematic, she maintained that she would not be concerned if the prescriptions were related to medical procedures. On cross-examination, Dr. Greaves explained that she would be concerned if Mother failed to disclose her history of drug abuse to her physicians because it was not a "wise thing" for her to do. Dr. Greaves further testified that she would be concerned to learn that Mother failed to request a non-narcotic pain medication from her treating physician.

Despite Mother's history of returning to Father in the past, Dr. Greaves opined that there was no indication that Mother would return to Father in the future. During her testimony, Dr. Greaves testified that she was not aware that Mother had completed a plan in the past to obtain custody of Gabriella and then immediately returned to Father. She was also not informed of the three previous episodes when the family had been involved with DCS or GDFCS. She knew only of the the previous termination action in Georgia. Dr. Greaves testified that these facts would change her recommendation to include "some long-term involvement, like in-home services, over the first couple of years that the children were back . . . to monitor the situation."

The parties stipulated that Dr. Irene Nicholas Ozbek was qualified as an expert in the field of rehabilitation psychology with significant experience in pediatric rehabilitation. According to her curriculum vitae, Dr. Ozbek is licensed as a psychologist in Georgia, a clinical psychologist in South Carolina, and a health service provider in Tennessee. In March 2015, Dr. Ozbek conducted a bonding assessment of Mother and the Children. Upon assessment, she determined that Mother appeared to be appropriate with the Children and that the Children reported appropriate discipline. Dr. Ozbek opined that Mother had a tendency to blame other individuals for her problems and had trouble trusting people. According to Dr. Ozbek, the Children are bonded to Mother, but Dr. Ozbek held no opinion as to the degree of bonding between Mother and the Children. Dr. Ozbek did opine that removal from Mother at this point would result in "a loss" to the

Children. Additionally, Dr. Ozbek elaborated that Chance did not appear to display any signs of developmental delay except for attention deficit disorder, but she noted that she had not performed a formal assessment of Chance's functioning. She testified that children with developmental delays "may have more trouble" when they begin school.

During her evaluation, Mother informed Dr. Ozbek that she was no longer attending her drug recovery meetings. Dr. Ozbek stated that Mother's failure to attend her drug recovery classes would cause her concern if other issues were occurring. By deposition, Dr. Ozbek testified that she would be concerned to learn that Mother had not informed her treating physicians about her history of drug abuse and that it was Mother's responsibility to so inform her physicians. Dr. Ozbek also indicated that, considering her history, Mother should have requested an alternative method for pain control.

Dr. Ozbek recognized an inconsistency in Mother's statements concerning Father in that Mother stated that she had no contact with Father and did not know his whereabouts despite Mother's awareness that Father was in a relationship with another woman. Dr. Ozbek also testified that Mother had not informed her of the incident regarding the telephone call between Father and Jude, which had resulted in Mother's instructing the Children not to disclose Father's communication to anyone. Dr. Ozbek acknowledged that the incident was "a problem" and that it was "a realistic possibility that the father might come back, based on prior patterns." Dr. Ozbek recommended leaving the Children with Mother with ongoing monitoring and supervision for the family for a period of one year.

Gabriella's kindergarten teacher, Patty Keller, testified regarding the relationship between Gabriella and Foster Parents. According to Ms. Keller, Foster Parents were very involved in Gabriella's education, and Ms. Keller had never witnessed them being negative toward Gabriella's biological mother in the presence of Gabriella. Instead, Ms. Keller testified that Foster Parents were very protective of Gabriella. Ms. Keller also related that Gabriella became visibly upset upon learning that she was to return to Mother's home. Gabriella began acting out, transitioned from being happy and talkative to stiff and tense, and became nervous and anxious. According to Ms. Keller, Gabriella began saving her food from school to eat at a later time. Ms. Keller explained that she told Gabriella, "I'm sure your mom will give you food at home," but Gabriella responded, "Sometimes, no." Ms. Keller also noted that while she listened to Gabriella express her concerns over leaving the foster home and returning to Mother's home, she became worried about Gabriella due to her changed behavior.

Upon Gabriella's return to Mother's physical custody and a change in schools, her new kindergarten teacher was Sara Starla Landrum. Ms. Landrum also subsequently taught Jude in a kindergarten summer class. Ms. Landrum testified that both children did

extremely well in her classes. Gabriella's first grade teacher, Tiffany Welch, testified that Gabriella had been doing extremely well and had been deemed intellectually gifted.

Following the conclusion of trial, the trial court entered a final order on December 14, 2015, finding by clear and convincing evidence that Mother had committed severe child abuse against Chance. The court recognized that the severe child abuse finding was a ground for termination of Mother's parental rights to Chance and his siblings, Jude and Gabriella. The trial court determined, however, that there was not clear and convincing evidence to demonstrate that the conditions leading to the removal of the Children persisted or that termination of Mother's parental rights was in the best interest of the Children, including Gabriella. Foster Parents timely appealed.

## II. Issue Presented

Foster Parents present one issue for our review, which we have restated as follows:

Whether the trial court erred by failing to find by clear and convincing evidence that the termination of Mother's parental rights was in the best interest of Gabriella.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96,

97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

> The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

> * * *

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence,"

including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Severe Child Abuse

Mother has not raised the trial court's finding regarding the statutory ground of severe child abuse as an issue on appeal. Instead, she has only responded to Foster Parents' question of whether the trial court properly found that the evidence did not clearly and convincingly demonstrate that termination of Mother's parental rights was in Gabriella's best interest. No other party has addressed the statutory ground of severe child abuse in the respective briefs. Nonetheless, due to the fundamental constitutional interest involved, we will address the statutory ground of severe child abuse as well as the best interest analysis. *See In re Carrington H.*, 483 S.W.3d at 525; *see also In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010).

Tennessee Code Annotated § 36-1-113 (Supp. 2016) lists the statutory grounds for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

A court may terminate the parental rights of a parent if he or she has committed severe child abuse against the child at issue or a half-sibling of such child. *See* Tenn. Code Ann. § 36-1-113(g)(4). Tennessee Code Annotated § 36-1-113(g)(4), as relevant to this action, provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

* * *

(4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian . . . .

(Emphasis added.) Tennessee Code Annotated § 37-1-102(b)(21) defines "severe child abuse," in relevant part, as: [11]

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death . . . .

(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct . . . .

As this Court has previously explained:

[A] parent's conduct is "knowing, and a parent acts or fails to act 'knowingly,' when . . . she has actual knowledge of the relevant facts and circumstances or when . . . she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to . . . her."

---

[11] Effective July 1, 2016, the General Assembly amended this section, modifying Tennessee Code Annotated § 37-1-102(b)(21) to Tennessee Code Annotated § 37-1-102(b)(22). *See* 2016 Pub. Acts Ch. 979 § 5 (S.B. 2121). We will cite to the version in effect at the time the petition was filed in July 2013.

19

*In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009) (quoting *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004)). "Serious bodily injury" is defined in Tennessee Code Annotated § 39-15-402(d) (Supp. 2016) as follows:

> "Serious bodily injury to the child" includes, <u>but is not limited to</u>, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

(Emphasis added.) The definition located in the first part of subsection 37-1-102(b)(21)(B) does not require that the perpetrator's actions toward the child be knowing. *See In re Samaria S.*, 347 S.W.3d 188, 203-05 (Tenn. Ct. App. 2011). The definition in the second part of subsection 37-1-102(b)(21)(B) regarding a parent's failure to protect a child from abuse does, however, require that a parent's actions be knowing. *See id.*

A judicial finding of severe child abuse has several statutory consequences to a parent. This Court has explained those consequences as follows:

> A finding of severe abuse triggers other statutory provisions, including a prohibition on returning the child to the home of any person who engaged in or knowingly permitted the abuse absent consideration of various reports and recommendations. Tenn. Code Ann. § 37-1-130(c). Even with such consideration,
>
> > No child who has been found to be a victim of severe child abuse shall be returned to such custody at any time unless the court finds on the basis of clear and convincing evidence that the child will be provided a safe home free from further such brutality and abuse.
>
> Tenn. Code Ann. § 37-1-130(d). Further, Tenn. Code Ann. § 37-1-130(g)(4)(A) provides that reasonable efforts to reunify a family are not required to be made if a court has determined that a parent has subjected the child or a sibling to severe child [abuse].
>
> The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself,

constitutes a ground for termination of parental rights. Tenn. Code Ann. § 37-1-130(g)(4) ("the parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court.")[.] The ground itself is proved by a prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.

*In re Samaria S.*, 347 S.W.3d at 201 (quoting *Dep't of Children's Servs. v. M.S.& J.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005)).

In its final judgment, the trial court made the following specific findings of fact regarding the statutory ground of severe child abuse:

> The removal from the [parents'] home of these three children and their placement with foster parents, Karen [P.] and Thomas [S.], the petitioners in this case, was . . . a result of Chance D[.'s] admission to T.C. Thompson Children's Hospital at age six months with a diagnosis of severe malnutrition and developmental delay. He had gained only eight ounces since his birth. The typical weight gain for a normal healthy child is eight pounds during this time frame.
>
> * * *
>
> Dr. Paul Dassow, who the Court finds is a qualified expert, opined that Chance D[.] was neglected to the extent he was likely to suffer serious bodily injury or death. He identifies as the neglect the mother's failure to seek medical help for her child when she realized he was not gaining weight. [Mother] failed to take her child to a doctor because she was afraid her children would be taken back into State custody. It was [Father] who ultimately took the child to the doctor. It is clear from the evidence that [Mother's] continued testimony that she fed the child appropriately is wrong. She continues to insist her feeding was appropriately frequent and nutritionally sound. However, the medical evidence establishes that testimony simply is not realistic. During Chance's four-day hospitalization, he began to respond to the feeding and has continued to gain weight and make developmental progress after discharge. At the time he was placed with [Foster Parents] upon his release from the hospital, he was developmentally delayed. His siblings, at the time of their placement when Chance was hospitalized, were behind on their vaccinations, had not been to the doctor in a year and a half, were behind in cognitive and motor skills

for their age, and exhibited some early problematic behavioral issues including hoarding food. Chance could not hold his head up and maintained an unresponsive blank stare. His stomach was distended and his body fat lacking. These are not normal findings for a child of his age and are consistent with the allegations of neglect. Under the care of the foster parents, all three children have developed well and began to thrive.

The Court finds by clear and convincing evidence the neglect of Chance is further evidence that through the time of removal the conditions resulting in neglect of the . . . children persisted. The Court also finds the neglect of Chance constitutes severe abuse. There is an issue raised as to whether or not Chance's condition meets the definition of severe child abuse. . . . Clearly, under the evidence established, the condition in which Chance D[.] presented to the hospital constituted severe abuse that was likely to cause serious bodily injury or death had intervention not taken place. [Mother] gave no indication she intended to change her course of conduct by presenting Chance to a health care provider. Rather, she is clear she refrained from doing so because of fear her children would be taken into the State's custody.

Accordingly, the Court finds by clear and convincing evidence that Chance D[.] was a victim of severe abuse as a result of [Mother's] neglect and that this neglect did cause serious and life-threatening bodily injury to Chance. Therefore, the Court finds grounds for termination of [Mother's] parental rights on the basis that Chance was subjected to severe abuse and that this severe abuse to Chance constitutes grounds for termination of her parental rights to Gabriella and Jude.

Citing to the definitions of severe child abuse in Tennessee Code Annotated § 37-1-102(b)(21)(A) and (B), the trial court ultimately concluded by clear and convincing evidence that Mother's conduct in failing to feed Chance appropriately and failing to seek medical care for Chance in his condition constituted severe child abuse. Upon our thorough review of the evidence, we agree.

This Court has previously upheld findings of severe child abuse against a parent or parents on the basis of severe malnutrition. *See In re Keara J.*, 376 S.W.3d 86, 102 (Tenn. Ct. App. 2012); *In re Samaria S.*, 347 S.W.3d at 207; *In re Jaden W.*, No. E2014-00388-COA-R3-PT, 2014 WL 7366683, at *9 (Tenn. Ct. App. Dec. 26, 2014). Relying on the definition in the first part of Tennessee Code Annotated § 37-1-102(b)(21)(B), this Court in *Samaria S.* upheld a severe child abuse finding against a mother when the child had been starved for a two-week period, resulting in "an infant whose appearance was

shocking, with no fat whatsoever under his skin, skin hanging over his bones, and in respiratory distress," and medical experts had testified that the "[m]other's neglect 'has caused or will reasonably be expected to produce . . . severe developmental delay.'" *In re Samaria S.*, 347 S.W.3d at 207.

In the case of *In the Matter of S.J.*, 387 S.W.3d 576, 593-95 (Tenn. Ct. App. 2012), this Court reversed a trial court's denial of a severe child abuse finding against a parent when the evidence in the record preponderated in favor of a finding that the parent knowingly neglected to meet the child's "basic life sustaining need for nutrition," which is "neglect that is likely to cause serious bodily injury," pursuant to Tennessee Code Annotated § 37-1-102(b)(21)(A). In that case, the Court explained that the "[m]other continued to starve [the child,] acting 'either in deliberate ignorance of or in reckless disregard of the information that ha[d] been presented to . . . her.'" *In the Matter of S.J.*, 387 S.W.3d at 593 (quoting *In re Samaria S.*, 347 S.W.3d at 206).

In the case at bar, Mother testified that she fed Chance frequently and appropriately during his first six months of life when he was living with her. Although the trial court found that all witnesses testified honestly, the court found that medical evidence established that Mother's testimony regarding her feeding of Chance was "simply not realistic." Accordingly, the trial court did not find Mother's testimony that she frequently and appropriately fed Chance to be credible. We emphasize that the trial court's determinations regarding witness credibility are afforded great weight on appeal. *See Jones*, 92 S.W.3d at 838.

In determining Dr. Dassow to be a qualified expert, the trial court relied heavily on his opinions regarding Chance's condition of severe malnutrition. At the time of trial, Dr. Dassow had been practicing medicine for more than twenty years. He testified that Chance's condition was the worst case of nutritional malnourishment he had ever seen, including during his work in African countries and Haiti. Although Chance was born with a normal birth weight, he only gained approximately eight ounces during the six months following his birth, placing him "shockingly below the oneth percentile" according to Dr. Dassow. He explained that eight pounds would be a normal weight gain for a child at six months old.

Mother testified that she was the individual responsible for feeding Chance. Dr. Dassow concluded that Mother's statements regarding when and what she fed the child were a "medical impossibility." While in Mother's care, Chance suffered severe malnutrition, but Chance consistently gained weight after he was removed from the parents' custody. Dr. Dassow opined that "Chance was neglected to the extent that he was likely to suffer serious bodily injury or death," noting that his opinion was "made with more than a reasonable degree of medical certainty . . . ." Dr. Dassow's opinion

23

supports the trial court's finding that Mother's testimony insisting that she fed Chance appropriately was "not realistic."

According to Dr. Dassow, severe malnutrition "can cause developmental delays, intellectual disabilities, and/or impairments, especially when the malnutrition is as severe and as early as Chance's." He further addressed the effects that severe malnutrition could have on Chance by determining that Chance's severe malnutrition "placed him at high risk for early death and that the degree of malnutrition he endured is reasonably expected to result in neurocognitive delays and disability that will become apparent during his primary schooling."

Foster Parents need not prove that Mother knowingly caused harm to Chance in order to satisfy the requirements of the first part of Tennessee Code Annotated § 37-1-102(b)(21)(B). *See In re Samaria S.*, 347 S.W.3d at 207. The definition of severe child abuse in this subsection requires the testimony of an expert to establish the effects of the abuse or neglect. *See* Tenn. Code Ann. § 37-1-102(b)(21)(B). Expert testimony by Dr. Dassow established that Mother's actions of neglect toward Chance resulting in severe malnutrition could reasonably be expected to produce severe developmental delay or intellectual disability in the child. Therefore, pursuant to Tennessee Code Annotated § 37-1-102(b)(21)(B), clear and convincing evidence supports the trial court's finding that Mother committed severe child abuse against Chance.

The trial court also addressed Tennessee Code Annotated § 37-1-102(b)(21)(A) when determining that Mother's actions constituted severe child abuse. This subsection requires proof that a parent's actions be performed with knowledge. *See* Tenn. Code Ann. § 37-1-102(b)(21)(A)(i). In the case at bar, Mother admitted to hospital personnel that she noticed that Chance was not growing approximately three months before he was admitted to the hospital. Mother also admitted to DCS that she did not seek medical treatment for Chance because she feared that the Children would be removed from her care. Mother testified that in her experience as a mother, she was aware that it was not appropriate for Chance to gain only eight ounces in six months. Despite this knowledge, Mother did not seek medical treatment for Chance. Even faced with Chance's emaciated condition, Mother was not the individual who sought medical treatment for him. Dr. Dassow opined that severe nutritional malnourishment such as Chance's was likely to cause serious bodily injury or death. Even though Chance survived and developed into a healthy two-year-old child, Dr. Dassow concluded that the effects of Chance's severe malnourishment would likely not be noticed until he attains school age. We therefore conclude that the evidence also clearly and convincingly supports the trial court's finding that Mother committed severe child abuse against Chance, pursuant to Tennessee Code Annotated § 37-1-102(b)(21)(A). We affirm the trial court's judgment that Mother

24

committed severe child abuse against Chance, pursuant to the definitions of severe child abuse contained in Tennessee Code Annotated § 37-1-102(b)(21)(A) and (B).

## V.  Best Interest of the Child

When at least one ground for termination of parental rights has been established, as here, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *See White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994).  When a parent has been found to be unfit by the establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White*, 171 S.W.3d at 194.

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

25

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As this Court has explained:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36–1–113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) (citations omitted).

The trial court made the following findings of fact relevant to the best interest analysis:

The children lived with [Foster Parents] for approximately 19 months, at which time they thrived and became attached to the foster parents while the foster parents became attached to them. Gabriella's kindergarten teacher noted a significant change in her behavior when she was to be moved from [Foster Parents'] home to [Mother's] home. She again began saving her snacks and expressing a concern about the availability of food.

[Mother] did not present any evidence of clean drug screens since she has had the children back in her custody. They were returned to her by DCS [on] October 2, 2013 after [Foster Parents] filed the instant petition for termination of parental rights and adoption on September 13, 2013.

Whether or not DCS's actions were appropriate in this regard is not dispositive of any issue in this case. . . . [Mother] did use some prescription pain medication after the children were returned to her but there is no evidence these prescriptions were obtained inappropriately. She can be criticized for not revealing to her health care providers her history of prescription drug abuse. The experts were critical of [Mother's] failure to reveal to the prescribing physicians her history of opiate abuse but there is no evidence of any ongoing drug usage by [Mother] since three months after the children were taken into custody. She tested positive for [benzodiazepines on] June 6, 2012.

The Court finds DCS has been diligent in working towards reunification of this mother and these children. She has accomplished all of the tasks on her permanency plan and now has a strong support system in her mother and her brothers. The children have been reunited with their mother for approximately two years. During that time, she has provided a home for them. The evidence contains no indication she has not remained alcohol and drug free. She has maintained employment at Blue Cross Blue Shield and has divorced her husband.[12] Gabriella's teachers indicate she is well-groomed and appears to be healthy, happy, and gifted. Her current teacher substantiated this condition. The Court finds the testimony of Alice Greaves, expert witness, very credible in her opinions that [Mother's] short-term use of prescription pain medicine in appropriate medical circumstances is not a relapse and does not indicate a problem. Further, she found no indication [Mother] would return to her abusive ex-husband. The mother has been involved in a parent education program with Family Menders and has addressed such issues as parenting skills, nutrition, domestic violence, and alcohol and drug counseling. In[-]home visits have proved satisfactory.

The tension in this case is between the children's current conditions and the contention of [Foster Parents] and witnesses well-acquainted with the Georgia history of this case and the early Tennessee involvement that [Mother's] history indicates she will relapse and these children are in jeopardy. There is reliance on Dr. Ozbek's recommendation for ongoing monitoring and supervision for this position. At odds with this position is the evidence of [Mother's] current situation and the stability the last two years has brought to this mother and these children while they are in her care. . . .

---

[12] The record reflects that Mother filed for divorce, but we have no indication whether such divorce has been finalized.

In addressing the best interest factors, the Court finds [Mother] has made such an adjustment of circumstance, conduct, and conditions as to make it safe and in the children's best interest to be in her home.

The Court finds [Mother] has accomplished a lasting adjustment after reasonable efforts by available social service agencies and it appears after two years that this lasting adjustment will persist.

[Mother] has had custody of her children for two years without any incident requiring the intervention of law enforcement or DCS.

Dr. Ozbek, who is an expert witness well regarded in this community and by this Court on the basis of her experience and training, believes the children are bonded with and attached to their mother and that removal from their mother would result in a loss, particularly to the older two children. She has observed appropriate interaction between the children and their mother and appropriate discipline. She has observed nothing to suggest a developmental delay in Chance and in her opinion it would not be in the best interest of these children to have the mother's parental rights terminated. The Court finds that a change in care givers would be detrimental to the children. The Court finds their physical environment in the mother's home is healthy and safe. In summary, the Court cannot find by clear and convincing evidence that it is in the best interest of these children for their mother's parental rights to be terminated. The evidence to the contrary is historical and for the Court to conclude [Mother] will relapse in her behaviors would require the Court to speculate. It is unfortunate the Court does not have the authority to require ongoing monitoring of this family's situation. However, perhaps it is equally appropriate that this family be permitted to move on to a normal functioning future without the intervention of the State in their daily lives.

In this case, we determine that the trial court erred in failing to address subsection 36-1-113(i)(6) when determining the best interest of the Children and in not fully addressing the facts presented regarding subsection 36-1-113(i)(1). Having conducted a thorough review of the record, we conclude that the evidence preponderates against the trial court's determination regarding best interest.

We emphasize that in the instant case, Mother's history is extremely troubling. In the past, Mother has repeatedly abused or neglected the Children and their siblings. In 2006, Mother drove while intoxicated with her one-year-old, H.F., in the automobile,

resulting in the parents and the child being transported to the hospital. W.F. was born addicted to drugs and suffered withdrawal symptoms when he was removed into state custody in Georgia. In 2009, Mother complied with services and ceased her drug use in order to regain custody of Gabriella. Upon regaining custody of Gabriella, Mother immediately resumed her relationship with Father and her drug use. After Mother subsequently failed a drug screen for DCS, she completed an alcohol and drug assessment and passed drug screens. However, after DCS closed its case, Mother admittedly resumed her drug use. In violation of the Georgia court's no-contact order, Mother consistently allowed the Children around Father for years despite his drug use and abusive nature. In fact, Father remained in the presence of the Children until they were removed in March 2012. Gabriella was developmentally delayed when she was initially placed with Foster Parents. Jude was born addicted to drugs. Finally, Chance nearly starved to death over a period of six months while in Mother's care.

The evidence supports that Mother's abuse and neglect of these Children has been extensive and damaging to the Children. Based on Mother's ten-year history of abuse and neglect of not only the Children but also their siblings, H.F. and W.F., Mother has repeatedly demonstrated that she is not a fit parent. Mother continues to deny any fault for Chance's failure to thrive and insists that she fed Chance appropriately during the six months after his birth. Dr. Dassow opined that Mother's statements regarding how much and when she fed Chance constituted a "medical impossibility." The trial court recognized that Mother's statements simply could not be true. Dr. Dassow opined that Chance is likely to have developmental issues arise when he begins school, resulting from the severe child abuse by Mother.

Mother has a long history of complying with requirements of child welfare agencies in both Tennessee and Georgia when necessary in order to regain or retain custody of her children before returning to her abusive husband, her illicit drug use, and her patterns of abuse and neglect of her children when a child welfare agency is no longer involved. Mother has repeatedly stated that she was divorcing Father in the past, only to reconcile with Father shortly thereafter. She similarly has complied with drug treatment, only to relapse when a child welfare agency is no longer monitoring the family. At the time of trial, the Children were in the physical care of Mother and doing well while being monitored by DCS and in-home services. Mother had obtained appropriate housing and steady employment. Testimony by DCS staff persons and Dr. Ozbek also established that the Children were bonded to Mother. However, Dr. Ozbek would not render her opinion as to the degree of bonding between the Children and Mother, indicating instead that the Children would experience "a loss" if removed from Mother's physical custody. During Mother's evaluation, she informed Dr. Ozbek that she was no longer attending the drug recovery classes. After being separated from Father, Mother testified that she had

recently filed for divorce from Father. The record contains no evidence that this divorce was finalized.

Foster Mother described visits between the Children and Mother that caused her concern. During an unsupervised visit, Mother did not report Jude's 104-degree fever but instead returned him to daycare without informing the daycare of his condition. Thus, Mother again failed to seek medical treatment for one of the Children when he was ill. Mother purportedly failed to ensure that the Children were fed properly by returning the Children to daycare after lunchtime, failing to feed the Children lunch, and failing to inform the daycare that the Children had not eaten lunch prior to their return. This incident resulted in the Children's complaints of hunger when they were picked up from daycare.

Furthermore, Mother's actions regarding the telephone contact from Father raise concerns. Assuming, *arguendo*, that Mother's explanation regarding how Father obtained her telephone number is true, Mother instructed the Children not to disclose the contact with Father to anyone. Mother testified at trial that she had not disclosed the contact to DCS for the same reason she chose not to seek medical care for Chance: she was afraid DCS would become involved.

Additionally, Mother failed to disclose her history of drug addiction to prescribing physicians and obtained five-short term opiate prescriptions in the fourteen months prior to trial. Mother admitted that she had not requested a non-narcotic pain medication prior to obtaining those prescriptions. Both Dr. Ozbek and Dr. Greaves criticized Mother's conduct in obtaining narcotic prescriptions for drugs she previously abused without disclosing her history of abuse to her physicians. Moreover, Dr. Ozbek termed Mother's actions as "high-risk behavior." There was no evidence in the record of any recent drug screens administered to Mother to corroborate her claimed sobriety.

We recognize that not every factor listed in Tennessee Code Annotated § 36-1-113(i) weighs in favor of termination in this case. However, we cannot overlook the severity and the extent of Mother's abuse and neglect toward the Children and their siblings throughout the years and, most significantly, her severe child abuse of Chance. Based on our review of the evidence in light of the statutory factors, we conclude that the trial court erred in determining that Foster Parents failed to prove by clear and convincing evidence that termination of Mother's parental rights was in the best interest of Gabriella.

VI. Conclusion

For the foregoing reasons, we affirm the trial court's finding that Mother committed severe child abuse against Chance and, therefore, affirm that statutory ground

as to Gabriella as well.  We reverse the trial court's finding regarding best interest and conclude that termination of Mother's parental rights is in Gabriella's best interest.  We therefore grant Foster Parents' petition to terminate Mother's parental rights to Gabriella.

This cause is remanded to the trial court, pursuant to applicable law, for enforcement of the termination of Mother's parental rights, a determination regarding Foster Parents' petition for adoption, and collection of costs assessed below.  Costs on appeal are assessed equally to the Appellees, Carla D. and the State of Tennessee, Department of Children's Services.

_____
THOMAS R. FRIERSON, II, JUDGE